UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SENIOR OPPORTUNITY FUND OPERATIONS-I LLC and
OPCO THAL LLC,

   Plaintiffs,

   v.                   Case No. 22-C-1008

ASSISTED LIVING BY HILLCREST LLC and
AMY DOOLITTLE DORO,

   Defendants.

## DECISION AND ORDER

   Plaintiffs Senior Opportunity Fund Operations-I LLC (SOFO) and OPCO THAL LLC (OPCO THAL) filed this action against Defendants Assisted Living by Hillcrest LLC (ALBH) and Amy Doro, alleging claims of breach of contract and breach of the implied covenant of good faith and fair dealing against ALBH, as well as claims of civil theft, conversion, and money had and received against both defendants. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Presently before the court is Defendants' partial motion to dismiss, seeking to dismiss Plaintiffs' claims of civil theft, conversion, and money had and received. For the following reasons, Defendants' motion will be denied.

## LEGAL STANDARD

   A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022). Rule 8 requires a pleading to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has

held that a complaint must contain factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a plaintiff is not required to plead detailed factual allegations, he must plead "more than labels and conclusions." *Id.* A simple, "formulaic recitation of the elements of a cause of action will not do." *Id.* In evaluating a motion to dismiss, the court must view the plaintiff's factual allegations and any inferences reasonably drawn from them in a light most favorable to the plaintiff. *Yasak v. Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi.*, 357 F.3d 677, 678 (7th Cir. 2004).

### ALLEGATIONS CONTAINED IN THE COMPLAINT

SOFO operates Caraton Commons, a senior living community that offers assisted living, memory care, and respite care. Compl. ¶ 24. It has various locations in De Pere and Green Bay, Wisconsin. *Id.* OPCO THAL operates Tender Hearts Assisted Living, a senior living and assisted living facility in Green Bay, Wisconsin. *Id.* ¶ 25.

In 2019, Plaintiffs sought to replace the company that was then-responsible for the management and day-to-day oversight of the Caraton Commons assisted living facilities. *Id.* ¶ 28. Plaintiffs searched for a trustworthy and reliable partner capable of managing the facilities and their operations, marketing the services offered at Caraton Commons to improve performance and financial returns, and ensuring that all residents were provided exceptional care. *Id.* Plaintiffs were introduced to Doro, the owner of a number of assisted-living facilities throughout northeast Wisconsin. *Id.* ¶¶ 27–28. As relevant here, Doro is the principal owner and executive director of ALBH, which provides healthcare management services at senior-housing facilities. *Id.* ¶ 26. Following a number of meetings and discussions, Plaintiffs decided to engage Doro and ALBH to provide management services at Caraton Commons. *Id.* ¶ 28.

2

SOFO and ALBH entered into a Management Services Agreement on January 1, 2020. *Id.* ¶ 29. In January 2021, Plaintiffs acquired Tender Hearts Assisted Living and determined to engage Doro and ALBH to provide management services at Tender Hearts. *Id.* ¶¶ 30–31. OPCO THAL and ALBH entered into a Management Services Agreement on January 14, 2021. *Id.* ¶ 32. Under the terms of the Management Services Agreements, ALBH agreed to provide a broad spectrum of management services in connection with the operation of the Caraton Commons and Tender Hearts communities, including recruiting and providing on-site, full-time managers for each of the facilities; recruiting, training, and overseeing management and administration of the facilities; providing clinical consulting and assistance; overseeing all necessary processes for securing and maintaining required licenses; reviewing, developing, approving, and implementing operational policies and procedures for all aspects of the management and operation of the facilities; preparing budgets; implementing financial controls and accounting procedures for maintaining proper financial records; providing billing and collections; and providing customer relations. *Id.* ¶ 33.

In exchange for ALBH's services, Plaintiffs agreed to pay ALBH a management fee equal to five percent of actual gross revenues for the applicable month. *Id.* ¶ 44. Plaintiffs also agreed to reimburse ALBH for all expenses ALBH incurred on Plaintiffs' behalf. *Id.* ¶ 42. ALBH was required to provide Plaintiffs with itemized statements for these expenses, and Plaintiffs, in turn, agreed to remit payment within 10 days of receipt of the itemized statement. *Id.* ¶ 45. Plaintiffs were not required to reimburse ALBH for any of its corporate home-office expenses incurred in connection with the agreements. *Id*. ¶ 46.

From January 2020 to March 2020, ALBH billed Plaintiffs for the "ancillary services" its employees performed on an hourly basis, consistent with the terms of the agreements. *Id.* ¶ 53. Beginning in March 2020, Doro notified Plaintiffs that ALBH was instituting a new "add-on

package" regarding reimbursements for ancillary services. *Id.* ¶ 54. Rather than bill Plaintiffs for services ALBH employees provided on an hourly basis, ALBH would bill Plaintiffs for a proportionate share of total expenses ALBH incurred in the performance of management-related services for all properties under ALBH's purview, including assisted living facilities owned by Doro personally and third parties unrelated to Plaintiffs. *Id.* The reimbursements ALBH sought under the "add-on package" were in addition to the five percent management fee ALBH already received under the agreements. *Id.* ¶ 56. The parties understood that the "add-on package" was intended to be temporary. *Id.* ¶ 55. Plaintiffs never agreed to pay ALBH additional amounts for management services under the guise of "add-on" expenses. *Id.*

From April 2020 to approximately November 2020, Plaintiffs did not receive any invoices for additional, ancillary services allegedly provided by ALBH, either under the "add-on package" for reimbursement or the previous framework for reimbursement on an hourly basis. *Id.* ¶ 57. In November 2020, following the discovery of the clerical error, ALBH submitted various invoices to Plaintiffs for services allegedly provided by ALBH at the Caraton Commons facility from April through November 2020. *Id.* ¶ 58. Each invoice sought a reimbursement of $24,900 for services allegedly provided by ALBH, on top of the numerous management-related services ALBH agreed to provide under the agreements in exchange for its five percent management fee. *Id.* ¶ 59. Plaintiffs then realized that, under the "add-on package" ALBH unilaterally implemented, ALBH was not billing Plaintiffs for the cost of ancillary services actually provided by ALBH but for a share of all costs ALBH incurred in the operation of its own business. *Id.* ¶ 60. In addition, ALBH routinely billed Plaintiffs for unreasonable or inflated amounts allegedly paid to third parties in connection with the management of the properties, including for advertising, computer and other IT services, and hiring-related expenses. *Id.* ¶¶ 63–64.

4

ALBH billed Plaintiffs for ancillary services through August 2022 but did not provide Plaintiffs with the invoices until late 2022. *Id.* ¶ 68. Upon receipt of the invoices, Plaintiffs repeatedly requested that Defendants supply additional information to substantiate the amounts demanded. *Id.* ¶ 71. Even though the agreements expressly require ALBH to provide itemized statements of expenses, ALBH refused to supply appropriate supporting information or identify the particular tasks ALBH employees were required to perform at Plaintiffs' properties. *Id.* ¶ 72. As a result, Plaintiffs refused to pay the invoices, absent further information regarding the basis for the invoiced amounts. *Id.* ¶ 74.

After Plaintiffs put Defendants on notice that the invoices were disputed, Defendants began diverting expected rent payments from Plaintiffs' pre-existing designated accounts to new accounts controlled by Defendants. *Id*. ¶¶ 111–12. Plaintiffs are parties to Deposit Account Control Agreements (DACA) and Deposit Account Instructions Service Agreements (DAISA) with their lender. *Id.* ¶ 107. These agreements restrict the use of Plaintiffs' deposit accounts and require funds to be deposited in a DACA and DAISA account for use consistent with the agreed financing restrictions. *Id.* Consistent with the restrictions imposed by Plaintiffs' lender and the DACA and DAISA, Plaintiffs required monthly rent and other fees owed by residents to be deposited into those designated accounts via Automated Clearing House (ACH) deposit. *Id.* ¶ 109. Defendants were aware of the restrictions imposed by the DACA and DAISA. *Id.* ¶ 108. Prior to August 2022, all monthly rent payments, whether from private payors or WPS health insurance (in the case of public pay residents) were made via electronic ACH. *Id.* ¶ 110. But in August 2022, Defendants arranged for rent payments from WPS or private pay residents to be made by paper checks delivered to ALBH. *Id.* ¶ 114. Plaintiffs became aware that their account preferences had been changed after expected rent payments were not deposited into the appropriate DACA and

5

DAISA accounts via ACH. *Id*. ¶ 115. Unaware at that time that Defendants had arranged for the changes themselves, Plaintiffs repeatedly requested that the checks be returned so that Plaintiffs could deposit them into the appropriate accounts and make funds available for use in operations. *Id*. Defendants refused to return the checks, claiming that all amounts received had been deposited into accounts for Plaintiffs' "benefit," in accordance with the agreements. *Id*. ¶ 116.

Plaintiffs later discovered that Defendants deposited all diverted funds into new bank accounts set up by Defendants, in their names and without Plaintiffs' knowledge or consent, at Capital Credit Union. *Id*. ¶ 118. Defendants opened the accounts after operating without those accounts for the previous two-and-a-half years under the agreements and only after the dispute arose regarding the amounts improperly invoiced to Plaintiffs. *Id*. ¶ 119. On August 8, 2022, Defendants provided Plaintiffs with a notice of termination of the agreements, after Plaintiffs provided Defendants with notices of termination in July and August 2022. *Id*. ¶¶ 87, 90, 121. On the same day Defendants provided their notice of termination, Defendants deposited more than $400,000 in rent checks in to the newly opened accounts. *Id*. ¶ 122. Though Doro later issued a check payable to SOFO for the precise amount of payroll due at Caraton Commons, the remaining funds were utilized by Doro to pay ALBH's disputed invoices, without Plaintiffs' knowledge or consent. *Id*. ¶¶ 123–24. Plaintiffs had, and continue to have, no access to the accounts opened by Defendants, including no access to any funds that remain in those accounts. *Id*. ¶ 125.

## ANALYSIS

### A. Civil Theft

Defendants seek dismissal of Plaintiff's civil theft claim. Wisconsin's civil theft statute, Wis. Stat. § 895.446, affords a civil right of action to recover damages from anyone who has committed criminal theft. Wisconsin's criminal theft statute describes five punishable offenses:

6

"theft of movable property; theft of money, negotiable security, instrument, paper, or negotiable writing by one in possession; theft of property from one with a superior interest; theft by fraud; and theft by failure to return property after expiration of a lease or rental agreement." *State v. Lopez*, 2019 WI 101, ¶ 17, 389 Wis. 2d 156, 936 N.W.2d 125 (citing Wis. Stat. § 943.20(1)(a)–(e)). Plaintiffs' claim is premised on Defendants' violation of Wis. Stat. § 943.20(1)(b), theft of money. That section provides that an individual commits civil theft when she, "[b]y virtue of his or her office, business or employment, or as trustee or bailee, having possession or custody of money . . . , intentionally uses, transfers, conceals, or retains possession of such money . . . without the owner's consent, contrary to his or her authority, and with intent to convert his or her own use or to the use of any other person except the owner." Wis. Stat. § 943.20(1)(b).

Defendants argue that Plaintiffs cannot plausibly allege a civil theft claim because Defendants acted with Plaintiffs' express authorization pursuant to the agreements. They assert that, at most, this case presents a "contract dispute where the value of services rendered is the only real issue." Defs.' Br. at 9, Dkt. No. 12-1. The existence of a contract does not, in itself, bar claims for civil theft. *See H.A. Friend & Co. v. Prof'l Stationary, Inc.*, 2006 WI App 141, ¶ 17, 294 Wis. 2d 754, 720 N.W.2d 96. Indeed, Wis. Stat. § 943.20(1)(b) is intended to specifically target those who "are entrusted with the property of another and who retain or use that property in a way that does not comport with the owner's wishes." *Aslanukov v. Am. Express Travel Related Servs. Co.*, 426 F. Supp. 2d 888, 893 (W.D. Wis. 2006). Plaintiffs' complaint alleges that they had preexisting bank accounts that were set up and used by the parties for over two years to pay for operating expenses. Compl. ¶¶ 107–09, 119. After Plaintiffs objected to Defendants' invoices and demanded that Defendants return certain checks, Defendants intentionally obtained and retained possession of Plaintiffs' funds under false pretenses; opened new bank accounts without

7

Plaintiffs' knowledge or consent; diverted funds belonging to Plaintiffs into the new accounts that Plaintiffs could not access; deposited over $400,000 in rent checks into those accounts on the same day ALBH terminated the agreements; and utilized the funds to pay the disputed invoices without Plaintiffs' knowledge or consent. *Id.* ¶¶ 118–19, 122–25, 139–46. Accepting Plaintiffs' allegations as true and giving them the benefit of the inferences to which they are entitled at this stage of the proceedings, Plaintiffs have stated a claim for civil theft.

Defendants further assert that Plaintiffs cannot assert a civil theft claim against Doro individually. But Doro, as ALBH's corporate officer, cannot escape liability for her conduct by hiding behind a corporate shield. Section 943.20(1)(b) explicitly "contemplates theft by a corporate officer." *H.A. Friend*, 294 Wis. 2d 754, ¶ 18 (noting that "[o]fficers are personally responsible for criminal acts committed in the name of the corporation" (citing *State v. Kuhn*, 178 Wis. 2d 428, 432, 504 N.W.2d 405 (Ct. App. 1993))). Plaintiffs allege that Doro, as ALBH's corporate officer, intercepted checks made payable to Plaintiff, deposited checks into a secret bank account, and refused to return the money when Plaintiffs asked. *See* Compl. ¶¶ 118, 123–25. In short, Plaintiffs have stated a claim against Doro individually.

**B. Conversion**

Defendants also assert that Plaintiffs failed to state a conversion claim. To state a claim for conversion, a plaintiff must allege "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, (3) resulting in serious interference with the rights of the owner to possess the property." *H.A. Friend*, 294 Wis. 2d 754, ¶ 11. Defendants argue that Plaintiffs' conversion claim fails because Plaintiffs do not credibly allege that Defendants took the disputed property without Plaintiffs' consent. Plaintiffs allege that, without Plaintiffs' consent and knowledge, ALBH and Doro intentionally took Plaintiffs' property by depositing rent payments

8

from Plaintiffs' designated accounts into secret accounts controlled by ALBH and Doro. Compl. ¶¶ 112, 115–16, 123. They assert that Defendants' actions interfered with Plaintiffs' rights to possess their own funds and use them for their needs. Plaintiffs allege that, by the time they became aware of the secret accounts, Defendants had paid themselves with the funds deposited in the accounts, leaving Plaintiffs without the funds to pay their employees, lenders, and operational expenses. *Id.* ¶¶ 124–25. Again, construing all allegations in Plaintiffs' favor, the court is satisfied that the complaint states a conversion claim against both ALBH and Doro.

**C. Money Had and Received**

Plaintiffs assert a money had and received claim against Defendants based on allegations that Defendants "received funds that are rightfully owed to Plaintiffs." *Id.* ¶ 160. Defendants do not contend that Plaintiffs' allegations fail to state a claim for money had and received. Instead, Defendants argue that Plaintiffs' claim must be dismissed because a plaintiff cannot recover simultaneously on both breach of contract and equitable claims. It is well-established that a plaintiff cannot recover on equitable theories when a contract controls the rights of the parties. *See Carroll v. Stryker Corp.*, 658 F.3d 675, 682 (7th Cir. 2011) ("In Wisconsin the quasi-contractual theories of quantum meruit and unjust enrichment are legal causes of action grounded in equitable principles and can be invoked only in the absence of an enforceable contract." (citations omitted)).

Plaintiffs argue that the existence of a contract does not bar their claim for money had and received because the claim is "premised on extra-contractual conduct that either occurred after the contracts were terminated or simply was not addressed in those contracts." Pls.' Br. at 23, Dkt. No. 20. They contend that the conduct supporting their claim for money had and received, including Defendants' theft and retention of funds that were owned by and owed to Plaintiffs, fall outside the scope of the parties' agreements. "Wisconsin law does not bar a party from seeking

9

equitable relief for a benefit conferred, if that benefit falls outside the scope of the parties' contractual relationship." *Meyer v. The Laser Vision Institute*, 2006 WI App 70, ¶ 26, 290 Wis. 2d 764, 714 N.W.2d 223 (citation omitted). The parties dispute which of Defendants' actions were contractual or extra-contractual. These disputes are better addressed on summary judgment after the parties have had the benefit of engaging in discovery and the court has the benefit of a more complete record. In short, Plaintiffs' money had and received claim will not be dismissed.

**IT IS THEREFORE ORDERED** that Defendants' partial motion to dismiss (Dkt. No. 12) is **DENIED**.

Dated at Green Bay, Wisconsin this 6th day of April, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge