SENIOR OPPORTUNITY FUND
OPERATIONS - I, LLC and OPCO
THAL, LLC

Case No. 22-CV-1008

Plaintiffs,

v.

ASSISTED LIVING BY
HILLCREST, LLC, AMY DOOLITTLE
DORO,

and

JACKIE DEY
650 Hobbins Street
Seymour, WI 54185

and

CAPITAL CREDIT UNION SERVICE
CORP.
825 Morris Avenue
Green Bay, WI 54304

Defendants.

## FIRST AMENDED COMPLAINT

Plaintiffs Senior Opportunity Fund Operations I, LLC ("SOFO") and OPCO THAL, LLC

("OPCO THAL") (collectively, "Plaintiffs"), by their attorneys, Reinhart Boerner Van Deuren

s.c., for their First Amended Complaint against Defendants Assisted Living by Hillcrest, LLC

("Hillcrest"), Amy Doolittle Doro ("Doro" or "Ms. Doro"), Jackie Dey ("Dey" or "Ms. Dey"),

and Capital Credit Union Service Corp. ("CCU") (collectively, "Defendants"), allege as follows:

## THE PARTIES

1.      Plaintiff Senior Opportunity Fund Operations - I, LLC ("SOFO") is a Georgia limited liability company with its principal place of business located at 365 Canal Street, Suite 2260, New Orleans, LA 70130.

2.      The sole member of SOFO is SOF Angels, LLC, a Delaware limited liability company.  The sole member of SOF Angels, LLC is SOF Holding Company, LLC.

3.      SOF Holding Company, LLC is a Georgia limited liability company.  Its members are:

      (a)      Gregory J. Almquist ("Almquist");

      (b)      ORLT, LLC;

      (c)      5100, LLC ("5100");

      (d)      DV Angels, LLC ("DV Angels");

      (e)      NNH Interests, LLC ("NNH Interests"); and

      (f)      Donwill Ventures, LLC ("Donwill Ventures").

4.      Almquist is an individual domiciled in and a citizen of the State of Georgia.

5.      ORLT is a Louisiana limited liability company.  Its members are: Don E. Chunn ("Chunn"), an individual domiciled in and a citizen of the State of Louisiana; and the FKC 2005 GST Trust No. 1 ("FKC"), a trust formed under the laws of Louisiana whose trustee is Chunn, and a citizen of the State of Louisiana.

6.      5100 is a Georgia limited liability company whose sole member is Almquist.

7.      DV Angels is a Louisiana limited liability company, whose members are: Donwill Ventures; David Lukinovich, an individual domiciled in and a citizen of the State of Louisiana; Charles A. Giraud ("Giraud"), an individual domiciled in and a citizen of the State of Louisiana; and Solomon's Portico, LLC ("Solomon's Portico").  Solomon's Portico is a Louisiana limited

liability company, whose members are Kim K. Lukinovich, an individual domiciled in and a citizen of the State of Louisiana, and her children, also individuals domiciled in and citizens of the State of Louisiana.

8. NNH Interests is a Georgia limited liability company. Its sole member is DV Angels.

9. Donwill Ventures is Louisiana limited liability company. Its members are ORLT and WB Ventures, LLC ("WB Ventures"). WB Ventures is a Louisiana limited liability company whose sole member is W. Howard Thompson ("Thompson"), an individual domiciled in and a citizen of the State of Louisiana.

10. Thus, for diversity purposes, SOFO is a citizen of Louisiana and Georgia. *See Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992 (7th Cir. 2007) ("For diversity jurisdiction purposes, the citizenship of an LLC is the citizenship of each of its members.")

11. Plaintiff OPCO THAL, LLC is a Delaware limited liability company with its principal place of business located at 365 Canal Street, Suite 2260, New Orleans, LA 70130.

12. The sole member of OPCO THAL, LLC is THAL Holdings, LLC, a Wisconsin limited liability company.

13. The members of THAL Holdings, LLC are:

(a) DV Angels;

(b) Donwill Ventures;

(c) Solomon's Portico;

(d) Thompson;

(e) Giraud;

(f) 5100;

(g) DV TH, LLC ("DV TH"); and

3

(h)    JPC Consulting, LLC ("JPC Consulting").

14.    DV TH is a Louisiana limited liability company whose sole member is Donwill Ventures.

15.    JPC Consulting, LLC is a Louisiana limited liability company whose sole member is Jennifer P. Chunn, an individual domiciled in and a citizen of the State of Louisiana.

16.    Thus, for diversity purposes, OPCO THAL is a citizen of Louisiana and Georgia.

17.    Defendant Assisted Living by Hillcrest, LLC is a Wisconsin limited liability company with its principal place of business located at 1889 Commerce Drive, De Pere, Wisconsin 54115. Upon information and believe, the members of Hillcrest are Amy Doro and Veronica Trofka, both individuals domiciled in and citizens of the State of Wisconsin.

18.    Thus, for diversity purposes, Hillcrest is a citizen of Wisconsin.

19.    Defendant Amy Doolittle Doro is a resident of the State of Wisconsin who, on information and belief, resides at 6402 Maple Rock Road Reedsville, WI 54230. Ms. Doro is the owner and operator of Assisted Living by Hillcrest, LLC.

20.    Thus, for diversity purposes, Doro is a citizen of Wisconsin.

21.    Defendant Jackie Dey is a resident of the State of Wisconsin who, on information and belief, resides at 650 Hobbins Street, Seymour, WI 54185. Ms. Dey is an employee of Hillcrest.

22.    For diversity purposes, Dey is a citizen of Wisconsin.

23.    Defendant Capital Credit Union Service Corp. is a Wisconsin corporation with a principal place of business located at 825 Morris Avenue, Green Bay, WI 54304.

24.    For diversity purposes, CCU is a citizen of Wisconsin.

## JURISDICTION AND VENUE

4

25.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000, exclusive of interests and costs.

26.     This Court also has personal jurisdiction over Defendants pursuant to Wis. Stat. §§ 801.05(1)(c), 801.05(3), and 801.05(5)(b).

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### *The Parties and Their Relationship*

28.     SOFO is the operator of Caraton Commons, a senior living community offering assisted living, memory care, and respite care, with various locations in De Pere, Wisconsin and Green Bay, Wisconsin.

29.     OPCO THAL is the operator of Tender Hearts Assisted Living ("Tender Hearts"). Tender Hearts is likewise a senior living and assisted living facility located in Green Bay, Wisconsin.

30.     Hillcrest is engaged primarily in the business of providing health care management services at senior housing facilities.  Its principal owner and Executive Director is Amy Doolittle Doro.

31.     Ms. Doro separately owns and operates her own assisted living facilities with locations throughout Northeast Wisconsin.

32.     Ms. Dey is an employee of Hillcrest and, on information and belief, works primarily alongside Ms. Doro.

33.     CCU is the bank where Defendants Doro and Dey opened additional accounts on behalf of Plaintiffs without their consent.  On information and belief, Defendant Doro had a pre-

existing relationship with a CCU employee and held other business accounts at CCU for some of her businesses.

34.     In or around 2019, Plaintiffs were seeking to replace the company then-responsible for management and day-to-day oversight of the Caraton Commons assisted living facilities, with the goal of securing a trustworthy and reliable partner capable of managing the facilities and their operations, marketing the services offered at Caraton Commons with the goal of improving performance and financial returns, and, above all, ensuring that all residents were consistently provided exceptional care.  Plaintiffs were introduced to Ms. Doro and, following a number of meetings and initial discussions, determined to engage her and Hillcrest to provide management services at Caraton Commons.

35.     On or about January 1, 2020, SOFO and Hillcrest entered into a Management Services Agreement under which Hillcrest agreed to provide management services at Caraton Commons (hereinafter referred to as the "Caraton Commons Agreement").  A true and correct copy of the Caraton Commons Agreement is attached hereto as **Exhibit A**.

36.     In January 2021, Plaintiffs acquired Tender Hearts Assisted Living.

37.     Thereafter, Plaintiffs similarly determined to engage Ms. Doro and Hillcrest to provide management services at Tender Hearts.

38.     On or about January 14, 2021, OPCO THAL and Hillcrest entered into a Management Services Agreement under which Hillcrest agreed to provide management services at Tender Hearts (hereinafter referred to as the "Tender Hearts Agreement").  A true and correct copy of the Tender Hearts Agreement is attached hereto as **Exhibit B**.

_**The Management Agreements**_

39.     Pursuant to the terms of the Caraton Commons and Tender Hearts Agreements, Hillcrest agreed to provide a broad spectrum of management services in connection with the operation of the Caraton Commons and Tender Hearts communities, including, among other responsibilities: recruiting and providing on-site, full-time managers for each of the facilities; recruiting, training and overseeing management and administration of the facilities by Owner's personnel; providing clinical consulting and assistance; overseeing all necessary processes for securing and maintaining required licenses; reviewing, developing, approving, and implementing operational policies and procedures for all aspects of the management and operation of the facilities, consistent with applicable legal requirements and industry standards; budget preparation and approval; implementing financial controls and accounting procedures for maintaining proper financial records; billing and collections; and customer relations.

40.     The above management responsibilities, and Hillcrest's other duties as manager, are described in more detail in the Caraton Commons and Tender Hearts Agreements and subject to the terms set forth therein.

41.     Greg Almquist was SOFO's primary designated representative under the terms of the Caraton Commons Agreement.  Keith Chunn and Chris Oswald have also served as the designated representative at certain times.

42.     Greg Almquist was OPCO THAL's primary designated representative under the terms of the Tender Hearts Agreement.  Keith Chunn and Chris Oswald have also served as the designated representative at certain times.

43.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Hillcrest was responsible for certain personnel services including, but not limited to, overseeing employee recruitment, retention, and salary administration.  Salaries for, and management,

retention and release of management level staff are subject to approval by SOFO and OPCO THAL. (*See* Exs. A and B, s. 3.1.2.)

44.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Hillcrest was responsible for overseeing the management of resident security deposits. (*See* Exs. A and B, s. 3.1.12.)

45.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Hillcrest was responsible for supervising resident care and taking all necessary actions to retain current residents and to improve occupancy at Caraton Commons and Tender Hearts Assisted Living. (*See* Exs. A and B, s. 3.1.23.)

46.     The Caraton Commons and Tender Hearts Agreements provide that, during the term of the respective agreements, Plaintiffs will provide Hillcrest with complete access to the communities at Caraton Commons and Tender Hearts, including records and offices. In addition, nothing in either the Caraton Commons Agreement or the Tender Hearts Agreement permitted Hillcrest to restrict Plaintiffs' access to those communities.

47.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Plaintiffs were permitted to inspect the communities at Caraton Commons and/or Tender Hearts Assisted Living, including any and all books and records located at those communities pertaining to operations. (*See* Exs. A and B, s. 5.5.)

48.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Plaintiffs agreed to reimburse Hillcrest for all expenses deemed to be Plaintiffs' responsibility to the extent such expenses were incurred by Hillcrest on Plaintiffs' behalf. (*See* Exs. A and B, s. 5.8.)

49.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, either party is permitted to terminate the agreement at any time without cause by giving at least sixty (60) days prior written notice to the other party.  (*See* Exs. A and B, s. 7.1.5.)

### ***Payment Terms***

50.     Under the terms of both the Caraton Commons and Tender Hearts Agreements, Hillcrest agreed to fulfill the above obligations in accordance with the terms set forth in those agreements.  In exchange, Plaintiffs agreed to pay Hillcrest a management fee equal to five percent (5.0%) of actual Gross Revenues for the applicable month.  (*See* Exs. A and B, s. 9.1.)

51.     In addition, Plaintiffs agreed to reimburse Hillcrest for certain "reimbursable expenses of Manager"—that is, Hillcrest's reasonable out-of-pocket expenses incurred in connection with the agreements and paid to third parties.  Hillcrest was required to provide Plaintiffs with itemized statements of such expenses, and Plaintiffs in turn agreed to remit payment within ten (10) days of receipt of any such itemized statement provided by Hillcrest. (*See* Exs. A and B, s. 9.4.)

52.     Plaintiffs were not obligated to reimburse Hillcrest for any of Hillcrest's corporate home office expenses incurred in connection with the agreements.  (*See* Exs. A and B, s. 9.3.)

53.     The Caraton Commons and Tender Hearts Agreements provide that before Plaintiffs are permitted to terminate the agreements, all reasonably *undisputed* amounts owed to Hillcrest must be paid in full.  (*See* Exs. A and B, s. 7.4 (emphasis added).)

### ***Unilateral Change in Payment Structure: the "Add-On Package"***

54.     At all times relevant to this action, Hillcrest managed the operations of the Caraton and Tender Hearts facilities from Hillcrest's corporate office in Green Bay.

55.     On information and belief, Hillcrest employs approximately 20 employees in that office, including training, accounting, and human resources personnel.

56.     Pursuant to the Caraton Commons and Tender Hearts Agreements, Plaintiffs were not obligated to reimburse Hillcrest for any of its "corporate home office expenses incurred in connection with" the Agreements, except as otherwise provided under the Agreements or agreed to by the parties.

57.     However, pursuant to Section 3.1.18 of the Agreements, to the extent Hillcrest provided or arranged for the provision of "ancillary services not covered by" the Agreements, including training, construction, or care-related consultants, Plaintiffs agreed to reimburse Hillcrest "for the reasonable direct and indirect costs related to such services."

58.     Consistent with the terms of the Agreements regarding the provision of such "ancillary services," Hillcrest occasionally provided additional assistance at the Communities, beyond the scope of specific management services otherwise required under the Agreements. Hillcrest often provided such ancillary services through its existing staff.

59.     Initially, from approximately January 2020 until March 2020, Hillcrest billed Plaintiffs for any such "ancillary services" performed by Hillcrest employees on an hourly basis, consistent with the terms of the Caraton Commons Agreement.

60.     In or around March 2020, however, Doro notified Plaintiffs that, rather than bill Plaintiffs for services provided by Hillcrest employees on an hourly basis, Hillcrest would be instituting a new "add-on package" for such reimbursements, under which Hillcrest would bill Plaintiffs for a proportionate share of total expenses incurred by Hillcrest in the performance of management-related services for all properties under Hillcrest's purview—including assisted

living facilities owned by Doro, and Trofka personally, as well as third parties unrelated to Plaintiffs.

61.     Initially, the add-on package was intended to be temporary.  Under the Agreements, Hillcrest was responsible for staffing the Caraton Commons and Tender Hearts facilities; however, due to difficulties fulfilling staffing needs brought on by the COVID-19 pandemic and other market factors, Hillcrest instituted the "add-on package."  The parties understood it was not intended to be a permanent arrangement, and Plaintiffs never agreed to pay Hillcrest additional amounts for management services under the guise of "add-on" expenses.

62.     The reimbursements Hillcrest was to seek under the newly-instituted "add-on package" would be in addition to the five percent management fee Hillcrest received under the Agreements, as well as any reimbursements under Section 9.4 of the Agreements for amounts paid to third parties (which the parties termed "Bill Back" costs).

63.     From April 2020 to approximately November 2020, Plaintiffs did not receive any invoices for any additional, ancillary services allegedly provided by Hillcrest, either under the new "add-on package" for reimbursement instituted by Hillcrest, or the previous framework for reimbursement on an hourly basis.

64.     In or around October 2020, Hillcrest discovered that, due to an apparent clerical error, no invoices had been sent to Plaintiffs.  Following the discovery of that clerical error, in or about November 2020, Hillcrest submitted to Plaintiffs various invoices for services allegedly provided by Hillcrest at the Caraton Commons facility from April through November 2020.

65.     Each of those belated invoices sought reimbursement of $24,900 for services allegedly provided by Hillcrest, on top of the numerous management-related services Hillcrest agreed to provide under the Agreement in exchange for its five percent management fee.

66.     It was only after Plaintiffs received these invoices that Plaintiffs realized that under the "add-on package" Hillcrest had unilaterally implemented, Hillcrest was billing Plaintiffs, not for the cost of ancillary services actually provided by Hillcrest, but for a share of all costs incurred by Hillcrest in the operation of its own business, including Hillcrest's payroll and other overhead, plus a markup. This practice continued at the Tender Hearts facility.

67.     In other words, although Plaintiffs previously agreed under the Caraton Commons and Tender Hearts Agreements to pay Hillcrest a five percent fee for the management of Plaintiffs' facilities, in addition to the agreed five percent fee, Hillcrest began allocating to Caraton Commons and Tender Hearts a portion of the amounts Hillcrest paid to its own employees (*i.e.*, their salaries and other payroll expenses) and invoicing Plaintiffs for those amounts as "add-on expenses."

68.     Under this new "add-on package" unilaterally implemented by Hillcrest, Plaintiffs discovered that Hillcrest was billing Plaintiffs for a substantial share of Hillcrest's own operational expenses and overhead, seeking reimbursement from Plaintiffs for costs associated with Hillcrest employees that had no connection to the Caraton Commons and Tender Hearts facilities, performed no work under the Management Agreements, and in many cases, had never even been to the properties during the period for which Plaintiff was billed. For instance, Hillcrest even billed Plaintiffs for a share of the amounts Doro paid to her executive assistant. Similarly, Hillcrest billed Plaintiffs for a share of the costs Hillcrest paid to various recruiters, despite the fact that Plaintiffs do not utilize and have not approved the use of recruiters at either facility.

*The "Bill Back Package"*

69. In addition to the five percent management fee agreed to by the parties, and the overhead expenses Hillcrest sought reimbursement for under the above-described "add-on package," Hillcrest continued seeking reimbursement for amounts paid to third parties in connection with the management of the properties, including for advertising, computer and other IT services, and hiring-relating expenses.

70. Although Hillcrest is entitled to reimbursement of "*reasonable* out of pocket expenses" incurred in connection with the management of the properties and paid to third parties, Hillcrest routinely billed Plaintiffs for unreasonable or inflated amounts allegedly paid to third parties, often with no explanation of the reason such third-party costs were necessarily-incurred in connection with the management of the properties.

71. For example, Hillcrest "billed back" to Plaintiffs approximately $2,000 for amounts paid to the online job-search database Indeed to list open positions at the facilities. Upon information and belief, the actual cost to list jobs on Indeed is approximately $40.

72. Hillcrest also "billed back" to Plaintiffs costs for advertising for the properties for advertisements that did not include Caraton Commons or Tender Hearts. More specifically, Hillcrest regularly paid for certain print and television advertisements and "billed back" the costs of such advertisements to all of the properties Hillcrest managed, including their own properties, as shared costs. After repeated requests by Plaintiffs, neither Hillcrest nor Doro explained how any such advertisements benefitted the Caraton Commons and Tender Hearts facilities, as opposed to the other assisted living facilities under Hillcrest's management, who were competitors of Plaintiffs. In fact, when Plaintiffs requested copies of the advertisements, Hillcrest refused to provide them.

73. In addition, Hillcrest also "billed back" to Plaintiffs amounts allegedly paid for rental of a maintenance truck even though Plaintiffs employ a maintenance person at the Caraton

Commons and Tender Hearts communities who has his own truck. Once again, when Plaintiffs requested further information regarding the basis for this "bill back" charge, Hillcrest and Doro refused to provide additional information.

### *The Disputed Invoices*

74.    From April 2020 until the Agreements were terminated in August 2022, Hillcrest continued to invoice Plaintiffs for alleged "ancillary services" supposedly provided by Hillcrest and Doro in connection with Hillcrest's management of the property. However, Hillcrest did not provide Plaintiffs with any of these invoices until late 2022. Pursuant to the revised structure for payment unilaterally implemented by Hillcrest in April 2020, Hillcrest billed for these additional amounts as part of the so-called "add-on package."

75.    But in reality, the amounts Hillcrest billed under this "add-on package" did not reflect actual ancillary expenses incurred by Hillcrest beyond the scope of its management duties under the agreements. Rather, Hillcrest's "add-on package" invoices reflected charges for services allegedly performed by Hillcrest employees that fell squarely within the scope of its management duties.

76.    For instance, Hillcrest billed to Plaintiffs "add-on" expenses for a pro-rata share of amounts paid, as salary, to maintenance, human resources, and recruiting personnel employed by Hillcrest. Hillcrest was required under the Agreements to provide management services in these areas and Hillcrest failed to explain why any maintenance, human resources, or recruiting services allegedly provided by Hillcrest employees should be considered ancillary to the management services Hillcrest was otherwise required to provide in exchange for its five percent management fee.

77.     Upon receipt of these improper invoices, Plaintiffs repeatedly requested that Hillcrest and Doro supply additional information regarding the basis for the charges included on such invoices in an effort to substantiate the amounts demanded and determine whether the invoiced amounts actually qualified as "ancillary services" eligible for reimbursement on top of the five percent management fee Hillcrest and Doro already received.

78.     The terms of the Agreements expressly require Hillcrest to provide itemized statements of expenses.  Despite this, Hillcrest repeatedly refused to supply appropriate supporting information to back up its invoiced amounts, or even identify the particular tasks the Hillcrest employees were "required" to perform at the Caraton Commons or Tender Hearts properties.

79.     Hillcrest invoiced Plaintiffs for alleged ancillary costs totaling hundreds of thousands of dollars.

80.     Plaintiffs objected to Hillcrest and Doro's invoices on the grounds that they failed to comply with agreements, insofar as they failed to include any detail concerning the expenses, including that the expenses were incurred by Hillcrest in connection with services provided at Caraton Commons and Tender Hearts. As a result, Plaintiffs' refused to pay the invoices, absent further information regarding the basis for the invoiced amounts.

81.     Hillcrest refused and, to date, still has not supplied any further information to substantiate the amounts invoiced to Plaintiffs as "add-on" or "ancillary" charges.

82.     Thus, all invoices remain disputed.

***Hillcrest's Failure to Fulfill its Obligations under the Agreements***

83.     Under the terms of the Agreements, Hillcrest was required to employ all communities' personnel to provide services in connection with the operation of the communities.

In other words, the community personnel hired by Hillcrest were not to be employed for any other purpose than to operate Caraton Commons and Tender Hearts.

84.     In violation of the Agreements, Hillcrest used Plaintiffs' employees for work at facilities other than Caraton Commons and Tender Hearts, and without providing reimbursement to Plaintiffs for those employees' wages.

85.     Under the terms of the Agreements, Hillcrest was required to retain current residents and to improve occupancy at Caraton Commons and Tender Hearts.  However, on or about June 24, 2022, Plaintiffs learned that Hillcrest was transferring residents, without explanation, from Tender Hearts and Caraton Commons to other facilities owned by Ms. Doro.

86.     Thereafter, in connection with those transfers, Hillcrest submitted invoices to Plaintiffs requesting refunds for residents' rent for the benefit of Ms. Doro's other facilities.

87.     Under the terms of the Agreements, Hillcrest was required to prepare and provide to Plaintiffs a proposed budget and cash flow projections for the year, for each year and for each facility.  Hillcrest never prepared such budgets.

88.     In addition, any expenditures for equipment or for items not addressed as operational needs in the budget that exceeded $5,000.00 required the prior written approval of Plaintiffs.  Hillcrest routinely made payments in excess of $5,000.00 without Plaintiffs' approval.

89.     Hillcrest was also required to establish and implement budget financial controls and monitoring systems, as well as business office bookkeeping and accounting procedures for the preparation of financial records.  Hillcrest never implemented any financial controls or monitoring systems, nor did it establish any procedures for the preparation of financial records.

90.     Hillcrest repeatedly failed to fulfill other management responsibilities, including by among other things: failing to provide appropriate oversight at the properties; failing to

disclose regulatory and/or legal issues including fines imposed on the properties by government agencies; and failing to ensure the availability of adequate supplies necessary to operate the facilities.

### *Termination of the Agreements*

91.    The Caraton Commons and Tender Hearts Agreements provide that Plaintiffs may terminate the agreements at any time without cause by giving at least sixty (60) days prior written notice to the other party.

92.    The Agreements further provide that Plaintiffs may not terminate the agreements unless all reasonably undisputed amounts owed to Hillcrest under the agreements have been paid in full.

93.    As a result of Hillcrest's conduct, in part, discussed *supra*, SOFO provided Hillcrest with a notice of termination dated July 12, 2022.  A true and correct copy of SOFO's notice of termination is attached hereto as **Exhibit C**.

94.    As of July 12, 2022, there were no outstanding undisputed amounts owed to Hillcrest outstanding over ten (10) days.

95.    In a written response dated July 18, 2022, Hillcrest asserted that SOFO's notice of termination was invalid, explaining that SOFO owes Hillcrest approximately $215,000 in undisputed management fees.  A true and correct copy of Hillcrest's response letter is attached hereto as **Exhibit D**.

96.    On August 3, 2022, and as a result of the conduct, in part, discussed *supra*, OPCO THAL provided Hillcrest with a notice of termination.  As of August 3, there were no outstanding undisputed amounts owed to Hillcrest outstanding over ten (10) days.

17

97.     SOFO and OPCO THAL maintain that there remain no reasonably undisputed amounts owed to Hillcrest.

98.     On or about August 8, 2022, Hillcrest provided Plaintiffs notice of purported defaults under the Caraton Commons Agreement, alleging that SOFO had failed to timely pay amounts owed under the Caraton Commons Agreement.  A true and correct copy of the Caraton Commons Default Notice is attached as **Exhibit E**.

99.     On that same date, Hillcrest also provided Plaintiffs notice of purported defaults under the Tender Hearts Agreement, alleging that OPCO THAL had failed to timely pay amounts owed under the Tender Hearts Agreement.  It also alleged that the August 3 notice of OPCO THAL was invalid because of the alleged failure to pay invoices.  A true and correct copy of the Tender Hearts Default Notice is attached as **Exhibit F**.

100.    Both the Caraton Commons and Tender Hearts Agreements required the continued management by Hillcrest during the termination period unless otherwise agreed to by the parties in writing.

101.    Since receiving the notices of termination, Hillcrest has continued to breach its management duties as required under the Caraton Commons and Tender Hearts Agreements.

102.    For instance, Hillcrest has failed to keep residency levels at the proper amounts, especially in 2022.

103.    Hillcrest also has made repeated attempts to prevent Plaintiffs and Plaintiffs' representatives from accessing software systems necessary for management of the facilities.

104.    In particular, Hillcrest has attempted to restrict access to the Lakeland web portal and ALIS web portal.  ALIS is the electronic medical record system and partial accounting system to which the Plaintiffs are contractually required to have access under the Agreements.

Access to ALIS is critical to the operations at the Caraton and Tender Hearts facilities, and the continued clinical service for residents there. Hillcrest attempted to restrict Plaintiffs' access to these critical services in advance of the transition of operational responsibility to Plaintiffs by calling the service providers and demanding that In the leadup to the transition of operational responsibility at the facilities following the termination of the Management Agreement, Hillcrest attempted to restrict Plaintiffs' access to these critical services by calling the service providers and demanding that personnel associated with SOFO and OPCO THAL be removed from access.

105. The Caraton Commons and Tender Hearts Agreements provide that, upon termination, Hillcrest is required to cooperate with Plaintiffs to ensure that operational responsibility for the communities is transferred as soon as practicable to Plaintiffs.

106. As part of Hillcrest's duty to transition operational responsibility upon termination, Hillcrest is required to deliver to Plaintiffs' or their designees possession and control of all bank accounts and all rents and income of the communities and other monies of Plaintiffs on hand or in any bank account as soon as reasonably practicable (but not later than five (5) business days after the effective date of such termination or expiration).

107. Upon termination, Hillcrest is further required to deliver to Plaintiffs or their designees any monies owed to Plaintiffs under the Agreements but received after termination.

108. Upon termination, Hillcrest is further required to deliver to Plaintiffs or their designees all materials and supplies used at the communities, and other property of the communities and belonging to Plaintiffs.

109. In addition, Hillcrest's obligations under the terms of the Agreements included purchasing inventory, supplies and non-capital equipment needed to properly operate the communities. However, upon receiving Plaintiffs' notices of termination, Hillcrest stopped

purchasing supplies, including but not limited to, certain personal protective equipment such as gloves, wipes, and masks needed to properly operate the communities and care for the residents. As a result, Plaintiffs were forced to purchase these items at a drug store and deliver the items to their employees at the communities.

110.     Upon information and belief, Hillcrest and Doro even instructed certain employees to dispose of needed supplies and equipment, including PPE, so as to deplete the resources necessary to properly operate the facilities post-termination.

111.     Hillcrest also stopped placing necessary food orders, forcing Plaintiffs to arrange for an emergency delivery of food to the Tender Hearts facility, at significant additional expense.

112.     Hillcrest also has refused to return to Plaintiffs equipment and other property of the communities and Plaintiffs in violation of Section 7.3.3(d) of the Agreements.  Despite repeated requests by Plaintiffs, Hillcrest failed or refused to return various printers, computers and check scanners that had previously been purchased by Plaintiffs for use at the facilities.  This refusal to return Plaintiffs' equipment, as required, impeded Plaintiffs' ability to assume operational control of the facilities and forced Plaintiffs to incur additional unexpected costs to replace the equipment.

### ***Fraudulent Check Scheme***

113.     Plaintiffs are parties to Deposit Account Control Agreements ("DACA") and Deposit Account Instructions Service Agreements ("DAISA") with their lender, which restrict the use of Plaintiffs' deposit accounts and require funds to be deposited in a DACA and DAISA account for use consistent with the agreed financing restrictions.

114.     At all times relevant to this dispute, Ms. Doro, Ms. Dey, and Hillcrest were aware of the restrictions imposed by the DACA and DAISA agreements.

115. Consistent with the restrictions imposed by Plaintiffs' lender and the DACA and DAISA agreements, Plaintiffs required any amounts payable to SOFO and/or OPCO THAL be deposited into those designated accounts. This included monthly rent and other fees owed by residents. To that end, Plaintiffs arranged for all monthly rent and other charges to be paid via electronic ACH deposit directly into the appropriate accounts designated by SOFO and OPCO THAL.

116. Prior to August 2022, all monthly rent payments, whether from private payors or WPS health insurance (in the case of public pay residents) were made via electronic ACH.

117. Plaintiffs put Ms. Doro and Hillcrest on notice that the invoices were disputed both because of the above-described improprieties and because of the lack of documentary support for the invoices, and for months the parties engaged ongoing discussions regarding those disputed invoices.

118. Rather than supply the appropriate support and back up to justify the disputed invoices and the amounts allegedly owed by Plaintiffs, as repeatedly requested by Plaintiffs and required under the Agreements, Hillcrest, Doro, and Dey instead devised a scheme to divert expected rent payments from Plaintiffs' designated accounts to accounts controlled by Hillcrest and Doro.

119. Due in part to these improprieties, Plaintiffs elected to terminate the Caraton Commons Agreement and the Tender Hearts Agreement.

120. On information and belief, prior to the beginning in August when the next rent payments were due, Ms. Doro arranged for any rent payments from WPS or private pay residents to be made, not by ACH, but by paper checks delivered to Hillcrest.

121.    Plaintiffs became aware that their account preferences had been changed from ACH to paper checks only after expected August rents were not deposited in the appropriate DACA and DAISA accounts via ACH as usual.  Unaware at that time that Defendants Hillcrest, Doro, and Dey had orchestrated those changes themselves, Plaintiffs repeatedly requested Ms. Doro and Hillcrest return the checks to Plaintiffs so that they could deposit them into the appropriate accounts and make funds available for use in operations, including, but not limited to, for payroll, loan payments, and other company expenses.  At that time, Plaintiffs were unaware that Hillcrest, Doro, and Dey had likely orchestrated the changes intentionally as part of a scheme to secure payment of their own improper and disputed invoices.

122.    Hillcrest and Doro refused to return the checks, claiming instead that all amounts received had been deposited into accounts "for the benefit of" Plaintiffs in accordance with the terms of the Agreements Hillcrest had previously elected to terminate.  Hillcrest and Doro advised Plaintiffs that $93,861.56 had been deposited into SOFO's existing checking account for purposes of covering payroll at Caraton Commons.  Hillcrest and Doro also indicated that there were insufficient funds available to cover required payroll at Tender Hearts and for other operational needs at the facilities.  As a result, Hillcrest and Doro indicated that OPCO THAL would need to transfer an additional $53,467.74 to cover payroll at Tender Hearts.

123.    Hillcrest and Doro did not account for the more than $300,000 in additional rent payments that Plaintiffs were due to receive at the beginning of the month, beyond the approximately $93,000 Hillcrest, Doro, and Dey had apparently deposited in SOFO's checking account.

124.    Upon further investigation, Plaintiffs discovered that Doro, Dey, and Hillcrest deposited all diverted funds into a new bank accounts setup by Doro, Dey, and Hillcrest at

Capital Credit Union.  Doro, Dey, and Hillcrest set up these new bank accounts in the name of SOFO and OPCO THAL, without their knowledge or consent.

125.    Doro, Dey, and Hillcrest opened the new bank accounts after operating without such an account for the previous two and a half years under the Agreements, and only after the dispute arose regarding the amounts improperly invoiced to Plaintiffs by Hillcrest.  Upon information and belief, Doro, Dey, and Hillcrest set up the new, secret bank account as part of a scheme to divert rental payments from Plaintiffs' appropriate DACA and DAISA accounts so that Doro and Hillcrest could pay their own disputed invoices, over Plaintiffs' objections.

### ***Capital Credit Union Policies.***

126.    CCU maintained various policies and procedures for opening new business accounts.

127.    One such policy contains the steps CCU must take when opening a new business account, including determining whether the business is eligible for membership; outlining what the business needs to provide to prove it exists; qualifying signers of the accounts and businesses; and building the business's profile. A true and correct copy of this policy is attached hereto as **Exhibit G**.

128.    Specifically, among other requirements, CCU must collect proper ID for all signers for the accounts, and ensure that the IDs on file are not expired.

129.    Under certain circumstances, CCU is also required to obtain a copy of the company EIN letter.

130.    CCU is further required to obtain proof of the business.  For an LLC, CCU must obtain copies of the articles of organization or a certificate of LLC.

131.     In fact, CCU's policy specifically notes that "If the person(s) establishing the account is not listed on the proof of business documentation" the person(s) must provide "reasoning for the discrepancy and their role in the business."

132.     CCU also operates under a Member Due Diligence (MDD) Procedure for verifying the identity of people who open accounts with the credit union.  A true and correct copy of the MDD Procedure is attached hereto as **Exhibit H**.

133.     The MDD Procedure provides that for business accounts, CCU "will verify the existence of the business by: For businesses using an Employer Identification Number (EIN) obtain a copy of the business' board resolution or other business paperwork stating who is authorized to open the account for the business."

134.     The MDD Procedure further provides that, "[f]or members using an EIN we must receive a copy of the Assignment letter or printout showing their EIN and Business name."

135.     Here, CCU failed to take any steps to verify that Doro and Dey were authorized to open business accounts.

136.     As a result of CCU's failure to verify the identities of Doro and Dey, Doro, Dey, and Hillcrest were permitted to open new business accounts in Plaintiffs' names and sign checks from those accounts to themselves, depleting the majority of stolen funds they deposited in Plaintiffs' accounts.

### ***The Opening and Use of the Capital Credit Union Accounts***.

137.     Upon information and belief, Doro contacted CCU by telephone on or about July 6, 2022 and indicated that she had another business account to open on behalf of SOFO.

138.     CCU sent Doro and Dey CCU's business account forms for completion and signatures, and also requested that they provide certain business documentation on behalf of

SOFO, including, but not limited to, the company EIN and a copy of the operating and management agreements.

139.    Doro and Dey sent back the signed forms, but never provided the requested business documentation.

140.    CCU opened the account in SOFO's name one day later, on July 7, 2022, despite the fact that Doro and Dey had not supplied any of the requested information.

141.    On that same day, a CCU employee completed a New Account Checklist for the OPCO THAL account and indicated that business paperwork had been collected from the member when, in fact, all business paperwork had not been provided by Doro or Dey.

142.    On information and belief, on August 2, 2022, an internal business account audit revealed that several documents remained missing from CCU's file for the account opened in SOFO's name. Despite this, the SOFO account remained open and accessible for use by Doro, Hillcrest, and Dey.

143.    On or about August 3, 2022, Doro contacted CCU by telephone indicating she had another business account to open on behalf of OPCO THAL.

144.    CCU again sent Doro and Dey CCU's business account forms for completion and signature, and also requested that they provide certain business documentation on behalf of SOFO and OPCO THAL, including, but not limited to, the company EIN and a copy of the operating and management agreements.

145.    Doro and Dey sent back the signed forms, and indicated that the requested business documents would be forthcoming.

146.    CCU opened the bank accounts opened in OPCO THAL's name one day later on August 4, 2022 despite the fact that Doro and Dey had not supplied any of the requested information.

147.    On that same day, a CCU employee completed a New Account Checklist for the OPCO THAL account and indicated that business paperwork had been collected from the member when, in fact, all business paperwork had not been provided by Doro or Dey.

148.    Over a week later, on or about August 12, 2022, a CCU representative emailed Doro and requested copies of the EIN letter and articles of incorporation for OPCO THAL "and/or something proving who can conduct business on behalf of the business."  Doro did not provide that information until August 15, 2022.

149.    After having received the requested information for the OPCO THAL account, a CCU representative asked Doro if she also had the documents for the SOFO account.  Thus, as of August 15, 2022, CCU still had not received the business documentation for the SOFO account despite having opened it more than a month earlier on July 7, 2022.

150.    CCU did not receive a copy of the requested business documents prior to opening the accounts in SOFO's and OPCO THAL's names.

151.    On or about August 11, 2022, Plaintiffs discovered that new accounts had been opened at CCU without Plaintiffs' knowledge or consent.

152.    Immediately upon learning about the accounts, Plaintiffs contacted CCU via email and put them on notice of the fact that the accounts had been opened in Plaintiffs' name without their knowledge or consent, and advised CCU that the funds deposited in those accounts had been procured by theft.  In fact, Plaintiffs explicitly stated that "all deposits to Capital CU are restricted under a loan agreement to be deposited into a DACA and DAISA account.  The

party that deposited these payments is fully aware of the restrictions and has fraudulently deposited these items.  Furthermore the party has not legal rights to these funds and their use."

153.    During an initial conversation with a representative of CCU, the CCU representative noted that none of the usual documentation required to open a business account at CCU had been supplied in this case and commented that he was surprised the account had been opened.

154.    Upon information and belief, following the initial conversation between a CCU representative and Plaintiffs, CCU initiated an internal investigation concerning the circumstances under which the accounts were opened, including Doro and Dey's authority to open the accounts.  On or about August 12, 2022, CCU Risk Department reached out to another CCU employee requesting additional information on the SOFO and OPCO THAL accounts, specifically whether CCU received any of the business documentation required to open the accounts.  CCU had not received any such documents from Doro or Dey.

155.    Yet, although CCU recognized during the call with Plaintiffs that CCU had failed to take the initial appropriate steps to verify Hillcrest, Doro, and Dey's authority to open the accounts and immediately took steps to investigate the circumstances under which the accounts were opened, CCU made no effort to freeze the funds in the account or reverse or place a hold on any of the transactions Doro and Dey initiated.

156.    Instead, in contrast to the process CCU followed when opening the accounts at the request of Doro and Dey, CCU demanded that Plaintiffs supply evidence that they were the rightful owners of the accounts.

157.     Plaintiffs immediately provided all requested information, including, but not limited to, a verification of identity and copies of Plaintiffs' operating agreements, organization charts, EINs, and the termination notices.

158.     Even after Plaintiffs supplied CCU with the requested information confirming they were the rightful owners of the accounts and the funds deposited in them, CCU still did not take immediate steps to freeze the accounts, or hold or reverse any transactions Doro, Dey and ALBH had initiated.

159.     On information and belief, the accounts were not frozen until August 18, 2022, a full week after CCU was made aware that Hillcrest, Doro, and Dey had opened the accounts under false pretenses, and Plaintiffs were the rightful owners of the accounts and all funds deposited in them by Doro and Dey.

160.     Upon information and belief, Doro continued writing checks payable to Hillcrest against the accounts after CCU was made aware Plaintiffs' rightful ownership of the accounts and the funds deposited in those accounts.  Nonetheless, CCU did nothing to freeze the accounts or otherwise prevent Doro's further authorized access to the funds deposited in those accounts without Plaintiffs' knowledge or consent.

161.     By the time CCU finally froze the accounts, the checks Hillcrest and Doro wrote to themselves had already cleared and the funds were no longer available in the CCU accounts Doro opened.

162.     Between August 8, 2022 and August 18, 2022, on at least five occasions, Doro either wrote checks herself, or requested the issuance of checks payable to Hillcrest totaling $279,588.37.  Doro personally signed at least four of those checks and, upon information and belief, deposited them in other bank accounts held by ALBH at Nicolet National Bank.

163.    Despite this, upon information and belief, CCU did not take any steps to notify Nicolet National Bank or Chase Bank of a dispute concerning the funds deposited at those institutions, much less request a reversal of the transactions or hold on the deposited funds for any period of time, including during the pendency of the dispute. and the majority of stolen funds they deposited in Plaintiffs' accounts was no longer available.

164.    Doro, Dey, and Hillcrest misrepresented their status as authorized representatives of SOFO and OPCO THAL when the accounts were opened.

165.    Doro and Dey provided CCU with a document entitled Limited Liability Company Authorizing Resolution for SOFO and OPCO THAL which certified that, during a meeting of all OPCO THAL's members on July 7, 2022 and August 4, 2022, Doro and Dey were designated as agents authorized to "exercise all of the powers listed in [the] resolution," including, but not limited to the power to open the accounts and write checks.  No such meetings were held on July 7, 2022 or August 4, 2022, and no such designations were made by the members of SOFO or OPCO THAL.

166.    Doro and Dey personally signed the Limited Liability Company Authorizing Resolution mispresenting their powers to exercise all of the powers listed in the resolution.

167.    Doro further certified in separate documents provided to CCU that she was the "Managing Member" of both OPCO THAL and SOFO and that no other member held more than a 25% stake in the companies. This is false.

168.    On August 8, 2022, Doro and Hillcrest provided Plaintiffs with a notice of termination of the Caraton Commons Agreement and the Tender Hearts Agreement. The Tender Hearts notice also alleged that the prior August 3 notice was invalid because of alleged unpaid invoices.

169.    Plaintiffs later learned that, on the same day Hillcrest provided notice of termination of the Agreements, Doro, Dey, and Hillcrest deposited more than $400,000 in rent checks in those newly opened accounts.

170.    Upon information and belief, while Ms. Doro issued a check payable to SOFO for the precise amount of payroll due at Caraton Commons of $93,861.56, the remaining funds were utilized by Ms. Doro to pay Hillcrest's disputed invoices, without Plaintiffs' knowledge or consent. Attached hereto as **Exhibit I** are true and correct copies of the disputed invoices provided by counsel for Hillcrest and Doro, which reflect payments to Hillcrest totaling $332,965.30.

171.    Among the disputed invoices Ms. Doro paid without Plaintiffs' knowledge or approval were approximately fourteen new invoices that had never before been seen by Plaintiffs.  These new invoices were issued by Hillcrest August 8, 2022, the same date Hillcrest provided notice of its intent to terminate the Agreements.  Hillcrest never previously provided these new invoices to Plaintiffs or sought payment towards any amounts purportedly owed under such invoices.  In fact, upon review of the various new invoices issued by Hillcrest on August 8, 2022 and paid by Doro that same day, without Plaintiffs' knowledge, Plaintiffs discovered that the new invoices purported to seek payment for payroll expenses that had already been paid by Plaintiffs weeks earlier.

172.    Doro and Hillcrest utilized the vast majority of rent payments that had been intended for Plaintiffs, but diverted by Hillcrest, Doro, and Dey, to pay Hillcrest's own disputed invoices, including the various new invoices issued by Hillcrest the same day seeking payment for amounts already paid by Plaintiffs.  As a result, Plaintiffs were left with minimal funds to pay for ongoing operations at the facilities, forcing Plaintiffs to deposit an additional $190,000 to

cover required payroll and loan payments, as well as other ongoing expenses for the management and operation of the facilities.

**COUNT I**
**BREACH OF CONTRACT**
**(as against Defendant Hillcrest)**

173.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 172 as though fully set forth herein.

174.    Plaintiffs entered into a valid and enforceable contract with Hillcrest under which Hillcrest agreed to provide management services to certain senior housing communities owned and operated by Plaintiffs.

175.    Hillcrest is in material breach of the Caraton Commons Agreement and the Tender Hearts Agreement by way of the conduct described herein.

176.    As a direct and proximate result of Hillcrest's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(as against Defendant Hillcrest)**

177.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 176 as though fully set forth herein.

178.    Plaintiffs entered into a valid and enforceable contract with Hillcrest under which Hillcrest agreed to provide management services to certain senior housing communities owned and operated by SOFO and OPCO THAL.

179.    In every contract, including the Caraton Commons and Tender Hearts Agreements involved in this matter, by operation of law, is an implied covenant of good faith

and fair dealing, which requires the parties to the agreement to act in good faith and in accordance with reasonable standards of fair dealing.

180.    The implied covenant of good faith and fair dealing also prohibits either party from engaging in any conduct or doing anything that deprives the other party of the fruits of the agreement or benefit of the bargain.

181.    Hillcrest's actions described herein breached Hillcrest's duty of good faith and fair dealing owed to Plaintiffs under the Caraton Commons and Tender Hearts Agreements.

182.    Hillcrest's violations of the covenant of good faith and fair dealing has resulted in Plaintiffs no longer receiving the benefit of their bargain.

183.    As a direct, proximate, and foreseeable result of Hillcrest's material breaches of its obligations under the terms of the Caraton Commons and Tender Hearts Agreements and its covenants of good faith and fair dealing, Plaintiffs have incurred and stand to incur substantial damages in an amount to be determined at trial.

<u>**COUNT III**</u>
<u>**CIVIL THEFT CONTRARY TO WIS. STAT. § 895.446**</u>
**(as against Defendants Hillcrest, Doro, and Dey)**

184.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 183 as though fully set forth herein.

185.    Defendants Hillcrest, Doro, and Dey intentionally obtained and retained possession of Plaintiffs' funds through fraud and misrepresentations.

186.    Specifically, Defendants Hillcrest, Doro, and Dey set up new bank accounts with Capital Credit Union in in the name of SOFO and OPCO THAL without Plaintiffs' knowledge or approval.

187.    Defendants Hillcrest, Doro, and Dey misrepresented their status as authorized representative of SOFO and OPCO THAL when the accounts were opened.

188.    Defendants Hillcrest, Doro, and Dey deposited more than $400,000 in rent checks owed to Plaintiffs in those newly opened accounts.

189.    Upon information and belief, while Ms. Doro issued a check payable to SOFO for the precise amount of payroll due at Caraton Commons of $93,861.56, the remaining funds were utilized by Ms. Doro to pay Hillcrest's disputed invoices, without Plaintiffs' knowledge or consent.

190.    Plaintiffs did not have access to the Capital Credit Union accounts, or the funds contained therein.

191.    Plaintiffs did not consent to Defendants Hillcrest, Doro, and Dey's retention and use of Plaintiffs' funds.

192.    Defendants Hillcrest, Doro, and Dey knew that Plaintiffs did not consent to their retention and use of Plaintiffs' funds.

193.    Defendants Hillcrest, Doro, and Dey intended to deprive Plaintiffs permanently of the possession of the funds.

194.    Defendants Hillcrest, Doro, and Dey's actions constitute a violation of Wis. Stat. § 943.20(1)(a) and (b).

195.    Pursuant to Wis. Stat. § 895.446, Plaintiffs are entitled to treble damages and their reasonable attorneys' fees resulting from Defendant Hillcrest, Doro, and Dey's unlawful conduct described above.

**COUNT IV**
**CONVERSION**
**(as against Defendants Hillcrest, Doro, and Dey)**

196.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 195 as though fully set forth herein.

197.    Defendants Hillcrest, Doro, and Dey set up new bank accounts with Capital Credit Union in in the name of SOFO and OPCO THAL without Plaintiffs' knowledge or approval.

198.    Defendants Hillcrest, Doro, and Dey misrepresented their status as authorized representative of SOFO and OPCO THAL when the accounts were opened.

199.    Defendants Hillcrest, Doro, and Dey deposited more than $400,000 in rent checks owed to Plaintiffs in those newly opened accounts.

200.    Upon information and belief, while Ms. Doro issued a check payable to SOFO for the precise amount of payroll due at Caraton Commons of $93,861.56, the remaining funds were utilized by Ms. Doro to pay Hillcrest's disputed invoices, without Plaintiffs' knowledge or consent.

201.    At the time, Plaintiffs did not have access to the Capital Credit Union accounts, or the funds contained therein.

202.    By depositing funds owed to Plaintiffs into a separate bank account of which Plaintiffs did not have control or access, and by using the funds owed to Plaintiffs to pay themselves, Defendants Hillcrest, Doro, and Dey took Plaintiffs' assets and converted them for their own use.

203.    By engaging in the acts and omissions described herein, Defendants Hillcrest, Doro, and Dey have wrongfully and illegally converted funds and assets of Plaintiffs for their own possession and use.

204.    Plaintiffs have suffered damages as a result.

205.    Defendants Hillcrest, Doro, and Dey acted with an intentional disregard of Plaintiffs' rights, entitling Plaintiffs to punitive damages.

## COUNT V
## MONEY HAD AND RECEIVED
**(as against Defendants, Hillcrest, Doro, and Dey)**

206.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 205 as though fully set forth herein.

207.    Through the conduct described herein, Defendants Hillcrest, Doro, and Dey received funds that are rightfully owed to Plaintiffs.

208.    Defendants Hillcrest, Doro, and Dey retained and unjustly enriched themselves with funds to which Plaintiffs are entitled in good conscience and equity.

209.    Plaintiffs demanded repayment of the funds from Defendants Hillcrest, Doro, and Dey.

210.    Defendants Hillcrest, Doro, and Dey have refused to repay Plaintiffs.

211.    Plaintiffs demand judgment in the amount of the funds wrongfully retained by Defendants Hillcrest, Doro, and Dey, totaling $332,965.30.

## COUNT VI
## NEGLIGENCE
**(as against Defendant Capital Credit Union Service Corp.)**

212.    Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 211 as though fully set forth herein.

213.    CCU had a duty to conduct the requisite due diligence prior to opening up new business accounts in Plaintiffs' names.

214.    In addition, once CCU became aware of a dispute as to the true ownership of the accounts and the funds deposited in them by Doro and Dey, CCU had a duty to promptly

investigate the circumstances under which the accounts had been opened and to take immediate steps to protect the funds deposited in them, including by freezing the accounts, placing a hold on or reversing any pending transactions, and/or notifying other financial institutions that funds being deposited into their accounts were the subject of a dispute.

215.    CCU breached its duty when it opened up new business accounts in Plaintiffs' names without taking appropriate steps to verify that the accounts were being opened by those authorized to do so and to determine that the businesses were eligible for membership.

216.    CCU further breached its duties when, having learned that Doro, Dey, and Hillcrest lacked authority to open accounts in Plaintiffs' name, and had done so without Plaintiffs' knowledge or consent, CCU failed to take any steps to freeze the accounts or otherwise protect the funds deposited in those accounts, or prevent further unauthorized access to those accounts, before the majority of the accounts had been depleted.

217.    CCU further breach its duties when it opened up the accounts without following its own policies and procedures, including by ensuring that IDs on file are not expired.

218.    As a result of CCU's breach, Doro and Dey were able to open new business accounts in Plaintiffs' names, to which Plaintiffs had no access, and misappropriate Plaintiffs' funds through use of those accounts.

219.    Plaintiffs' suffered damages as a result of CCU's breach.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request the entry of judgment in their favor and against Hillcrest as follows:

      A.    An award of actual and compensatory damages in an amount to be determined at trial;

B.  An award of costs, including attorneys' fees that are reasonably incurred;

C.  An award of punitive damages to the extent permitted by applicable law;

D.  Treble damages pursuant to Wis. Stat. § 895.446; and

E.  Such other and further relied as this Court deems proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated this 8th day of May, 2023.

| | |
|---|---|
| Reinhart Boerner Van Deuren s.c. | *s/ Danielle E. Marocchi* |
| 1000 North Water Street, Suite 1700 | Thomas M. Burnett |
| Milwaukee, WI 53202-3186 | WI State Bar ID No. 1076010 |
| Telephone: 414-298-1000 | tburnett@reinhartlaw.com |
| Facsimile: 414-298-8097 | Danielle E. Marocchi |
| | WI State Bar ID No. 1103023 |
| Mailing Address: | dmarocchi@reinhartlaw.com |
| P.O. Box 2965 | |
| Milwaukee, WI 53201-2965 | *Attorneys for Plaintiffs* |

49420953